UNITED STATES DISTRICT COURT
NORTHERN DISTRICT of INDIANA
SOUTH BEND DIVISION

THE CENTER FOR HOSPICE AND
PALLIATIVE CARE INC.,

    Plaintiff,

    v.

UNITED STATES DEPARTMENT of
HEALTH & HUMAN SERVICES,

    Defendant.

Case No. 3:24-CV-156-CCB

## OPINION AND ORDER

This case is an appeal of an ALJ decision upholding an administrative

determination that four patients of Plaintiff The Center for Hospice and Palliative Care,

Inc., were not terminally ill and thus not covered by the Medicare Part A Hospice

Benefit.

### BACKGROUND

**I.**    **Regulatory Framework**

Plaintiff The Center for Hospice and Palliative Care, Inc. is Medicare certified to

offer hospice services in Indiana and is incorporated as a nonprofit in the state. (ECF 1

at 1–2). Plaintiff provides services to patients under the Medicare Part A Hospice

Benefit ("Hospice Program"), a fully subsidized health insurance program administered

by the Centers of Medicare and Medicaid Services ("CMS") on behalf of the Department

of Health and Human Services ("HHS"). (*Id.* ¶ 12).

The Hospice Program operates by paying a predetermined fee to a certified service provider ("provider") for each day an eligible individual receives hospice care. (*Id.*). The Hospice Program is comprehensive and includes physician services, inpatient care, medical supplies, home aid, and various therapy and counseling services. (*Id.*¶ 13).

In order to receive Hospice Program benefits, an individual must file a statement acknowledging that he "has been given a full understanding of the palliative rather than curative nature of hospice care." (*Id.* ¶ 14). In acknowledging this, individuals agree to waive certain Medicare services "related to the treatment of [their] terminal condition" rather than the "palliation or management" of terminal illness. (ECF 1 ¶ 14).

Provider reimbursement is conditioned on patient eligibility; the patient must be terminally ill to qualify for the Hospice Program. (*Id.*). Terminal illness is when "the individual has a medical prognosis that his or her life expectancy is six months or less if the illness runs its normal course." (*Id.* ¶ 16). "Life expectancy" is defined as a greater than fifty percent chance of death within six months. (*Id.*).

CMS contracts with private companies called Medicare Administrative Contractors ("MACs") to process and pay Medicare claims to providers on behalf of CMS. MACs create and issue guidance through "Local Coverage Determinations," ("LCDs") which are region-specific guidelines designed to "assist providers in submitting correct claims." (*Id.* ¶ 23). These guidelines do not undergo the federal rulemaking process, and thus do not bind the ALJ's decision. (*Id.* ¶ 26). Still, the ALJ must give "substantial deference to [LCDs] if they are applicable to a particular case." (*Id.*). Thus, while a patient does not always need to meet an LCD's requirements to be

eligible for the Hospice Program, the ALJ must explain why an LCD was not followed if he declines to apply it. (*Id.* ¶ 27). Here, the relevant LCDs are supplied by the MAC Palmetto GBA, which also processes the payments between Plaintiff and CMS. (*Id.* ¶¶ 25, 35).

After a provider supplies a service, a MAC usually makes an initial payment to the provider. CMS then contracts with third-party Supplemental Medical Review Contractors ("SMRC's") to conduct post-payment review of whether an item or service is covered under Medicare. (*Id.*). If an SMRC determines that a provider was overpaid, CMS or its MAC contractors may seek recoupment from the provider in most situations. (*Id.* ¶¶ 28–29.). The relevant SMRC in this case was Noridian Healthcare Solutions, LLC. (*Id.*). If a claim is denied, the provider must (1) seek redetermination from its MAC and then (2) seek reconsideration by a private Qualified Independent Contractor ("QIC") before requesting an ALJ hearing. (*Id.* ¶¶ 32–33).

## II.    Factual Background

Between January 1, 2017 and November 20, 2019, Plaintiff submitted claims for service under the Hospice Program to its MAC Palmetto GBA ("Palmetto"), which paid the claims. On January 17, 2020, the SMRC Noridian Healthcare Solutions, LLC ("Noridian") requested 303 claim records for 10 patients billed under the Hospice Program between 2017 and 2019. (*Id.* ¶ 34). Plaintiff complied with this request, providing all relevant records to Noridian for review. (*Id.*). On January 22, 2021, Noridian informed Plaintiff that it had denied all 303 claims, alleging a $1,152,096.53

overpayment. (*Id.* ¶ 35). Palmetto then issued a series of demand letters requesting that Plaintiff refund the alleged overpayment. (*Id.*). Plaintiff first sought redetermination with Palmetto, which upheld 281 of the 303 claim denials. Plaintiff then sought reconsideration with a QIC, which upheld 133 of the remaining 281 claim denials pertaining to seven patients. (*Id.* ¶¶ 36–37). These claims were denied on the basis that the seven patients were not "terminally ill" as required by the Hospice Program and were thus ineligible (*Id.* ¶ 37; ECF 43 at 1618–1790).

On June 6, 2022, Plaintiff requested review of all 133 remaining claim denials before an ALJ. (*Id.* ¶ 38). Plaintiff retained an expert witness, Dr. Stephen A. Leedy, who is a board-certified hospice physician and certified hospice medical director. (*Id.* ¶ 41). Dr. Leedy reviewed the records submitted to Noridian and concluded that each patient at issue was terminally ill for purposes of Hospice Program eligibility during the dates under review. (*Id.*). The hearing took place on August 18, 2022. (*Id.* ¶ 42). Plaintiff was the only party to appear at the hearing, and Dr. Leedy was the only expert witness or physician to testify. (*Id.*).

On December 22, 2022, the ALJ issued a decision upholding denial of 106 claims regarding four of the patients, on the basis that those four patients were not terminally ill ("Contested Patients"). (*Id.* ¶ 44). Plaintiff timely appealed to the district court under 42 C.F.R. § 405.1132. (*Id.* ¶¶ 46, 48). The Court now reviews the ALJ's decision.

## STANDARD

Parties may appeal a decision by an ALJ to a federal district court. The court must affirm the ALJ's decision if it is supported by substantial evidence and free from

legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Legal

errors are reviewed de novo. *Keeling v. Peabody Coal Co.*, 984 F.2d 857, 862 (7th Cir. 1993).

Substantial evidence is "more than a mere scintilla of proof." *Kepple v. Massanari*, 268

F.3d 513, 516 (7th Cir. 2001). It means "evidence a reasonable person would accept as

adequate to support the decision." *Murphy v. Astrue*, 496 F.3d 630, 633 (7th Cir. 2007); *see*

*also Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (defining substantial evidence as

"such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.") (citation and quotations omitted). In determining whether there is

substantial evidence, the court reviews the entire record. *Kepple*, 268 F.3d at 516. But that

review is deferential. *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). A reviewing

court will not "reweigh evidence, resolve conflicts, decide questions of credibility, or

substitute [its] own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d

535, 539 (7th Cir. 2003) (quoting *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).

Nonetheless, if, after a "critical review of the evidence," the ALJ's decision "lacks

evidentiary support or an adequate discussion of the issues," this Court will not affirm

it. *Lopez*, 336 F.3d at 539 (citations omitted).

While the ALJ need not discuss every piece of evidence in the record, he "must

build an accurate and logical bridge from the evidence to [the] conclusion." *Dixon v.*

*Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Further, the ALJ "may not select and

discuss only that evidence that favors his ultimate conclusion," *Diaz*, 55 F.3d at 308, but

"must confront the evidence that does not support his conclusion and explain why it

was rejected," *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). Ultimately, the ALJ

must "sufficiently articulate his assessment of the evidence to assure" the court that he "considered the important evidence" and allow the court "to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985) (internal quotation marks omitted)).

## ANALYSIS

Plaintiff objects to the ALJ opinion on three grounds. First, Plaintiff argues that the ALJ misapplied the LCD guidelines. Second, Plaintiff argues that the ALJ's opinion improperly discredited or ignored the opinions of its testifying expert Dr. Leedy, who stated that all patients were terminally ill. Finally, Plaintiff argues that the ALJ misapplied the waiver and limitation-of-liability provisions in Sections 1870 and 1879 in the Social Security Act, codified at 42 U.S.C. § 1395gg and § 1395pp, respectively.

### I. LCD Application

When CMS contracts with private companies to process and pay claims on its behalf, those companies issue guidance criteria on the applicability of coverage in a specific area. These are known as "Local Coverage Determinations" or "LCDs." Though ALJ's are bound to give "substantial deference" to LCDs, they may depart from them "in a particular case" if the ALJ "explain[s] the reasons why the policy was not followed." 42 C.F.R. § 405.1062(a)–(b).

Plaintiff argues that the ALJ's opinion was flawed as a matter of law because the ALJ applied the LCD guidelines as "absolute requirements." (ECF 49 at 30). Plaintiff is correct that an ALJ may depart from the LCDs if that departure is properly explained. 42 C.F.R. § 405.1062(a)–(b). But this exception demonstrates the default rule: that an ALJ

6

*may* rely on the LCD if there is no evidence that the LCD insufficiently applied to a specific case. *See id.* There is no converse rule: that an ALJ must always explain why he followed an LCD.

While Plaintiff argues that the LCDs should not have been "determinative," the parties do not contest that the ALJ applied the correct LCDs in all situations. Plaintiff presents no argument that the ALJ consulted the wrong LCDs with regard to patients B.A, K.C, and S.M, or that the ALJ was wrong to conclude that there was no on-point LCD for patient W.F, who was diagnosed with cancer. (ECF 61 at 17). At the ALJ hearing, Plaintiff made no argument that the LCDs were not applicable. *See Turpen v. Astrue*, No. 1:11-CV-00729-JMS, 2012 WL 2888586, at *9 (S.D. Ind. July 13, 2012) ("the Commissioner cannot change tacks on appeal by making arguments that the ALJ did not make" (citing *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 194 (1947))).

Even now, Plaintiff presents no evidence that patients B.A., K.C., or S.M's conditions presented a situation where the LCDs would be inapplicable or an insufficient guide to determining eligibility. In fact, Plaintiff's main argument is precisely that the ALJ *misapplied* the LCD guidelines, not that the ALJ was wrong to apply them in the first place. (ECF 49 at 12, 19–20, 30). While in some cases an ALJ may need to explain why an LCD is not applicable if that applicability is called into question by argument and evidence, this is not one of those cases. Plaintiff provides no evidence that the ALJ improperly referenced the LCD guidelines as providing the rule for determining eligibility in this case.

II.    **Treatment of Plaintiff's Expert Testimony**

Plaintiff objects to the ALJ's treatment of its testifying expert, Dr. Stephen A. Leedy. First, it argues that the ALJ erred as a matter of law by departing from the opinions of its expert. Second, it argues that the ALJ did not properly explain why he discounted the expert's conclusions.

1. **Whether the ALJ Was Wrong to Discount Expert Opinion as a Matter of Law**

First, Plaintiff suggests that it was improper for the ALJ to reach a conclusion different from its expert testimony, when there was no other contradictory expert testimony in the record. However, although ALJs must consider expert testimony, they are not bound to follow it. *See Fitzgerald v. Colvin*, No. 2:14-CV-417-PRC, 2016 WL 491641, at *7 (N.D. Ind. Feb. 8, 2016) ("The ALJ was required to consider the medical opinion; the ALJ was not bound to follow it."); *Cox v. Comm'r of Soc. Sec.*, No. 1:24-CV-372-CCB-SJF, 2025 WL 2717181, at *3 (N.D. Ind. Sept. 22, 2025) ("[Plaintiff] contends that the ALJ's rejection of all medical opinions was legal error. Not so."). Rather, the ALJ may look to a wide variety of evidence in the record, and can determine that an expert's opinion is unreliable or lacking in credibility based on a variety of factors. *See Walsh v. Shalala*, No. 93 C 5641, 1994 WL 33960, at *2 (N.D. Ill. Feb. 4, 1994) ("It is entirely proper for the ALJ to weigh and consider the evidence."). Thus, the fact that the ALJ discounted Plaintiff's expert is not by itself problematic.

Similarly, Plaintiff argues that it would be improper for an ALJ to prioritize the opinions in the QIC finding over contradictory expert testimony. This argument fails for

similar reasons; if there was evidence in the record suggesting that the conclusions in the QIC were more reliable than the expert opinion, the ALJ might properly give that evidence greater weight. *See Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989).

2. **Whether the ALJ Properly Drew a Logical Bridge in Rejecting Expert Testimony**

Second, Plaintiff argues that the ALJ did not draw a "logical bridge" between the evidence in the record and the ineligibility finding for the Contested Patients. Specifically, Plaintiff argues that the ALJ did not properly address contradictory expert testimony. Here, Plaintiff's argument finds firmer footing.

Although an ALJ may discount expert opinions, he certainly must provide legitimate reasons for doing so. *See Chance T. S. v. Saul*, No. 18 CV 50339, 2020 WL 533704, at *3 (N.D. Ill. Feb. 3, 2020) ("To discount evidence from a medical professional, the ALJ must explain any error in the underlying medical professionals' reasoning or analysis."). For example, an ALJ might find that the expert is not properly qualified to testify on the matter, used an unreliable methodology, or ignored relevant data. *See Bunge Corp. v. Carlisle,* 227 F.3d 934, 940 (7th Cir. 2000) ("where the testimony of medical experts is at issue, the ALJ is entitled to accept any part of an expert's testimony or reject it completely.").

In the hearing, Plaintiffs laid a foundation for Dr. Leedy's expert qualifications by establishing his experience in hospice care, medicine, prognosis, and the LCD guidelines' application regarding terminal illness. (ECF 43 at 1708–12). In response, the ALJ stated that he found Dr. Leedy to be an expert and would "consider his testimony

9

accordingly." (*Id.* at 1712). In the written opinion, the ALJ summarized Dr. Leedy's analysis of each patient without critique, including the medical conclusion that terminal diagnoses were supported for each one. (*Id.* at 1633–59).

But the ALJ then concluded that overall, a terminal prognosis of six months or less was not supported for the four Contested Patients. (*Id.*). But the explanation for these conclusions essentially consisted of a conclusory statement that patient conditions were "not so significant as to support a terminal prognosis." (ECF 1635 at 1790).[1] Furthermore, while, as discussed above, it is not error as a matter of law to discredit an expert's opinion, the ALJ gave little explanation for why he disregarded Dr. Leedy's expert analysis.[2] Thus, the ALJ failed to build a "logical bridge" or show "substantial evidence" for his conclusions because he (1) did not explain or provide evidence for his discounting of symptom "significance" and (2) did not explain why he found contrary

---

[1] This quote occurs in the ALJ's analysis of patient B.A's record, but the same pattern occurs in the analyses of the other three patients. *See, e.g., id.* at 1641 (concluding regarding patient K.C. that "the Beneficiary did not have sufficient secondary conditions to support a prognosis of six months or less") ; *Id.* at 1646 (concluding, regarding patient W.F., without explaining his refutation of the expert's conclusion or evidence of secondary decline symptoms, that "[o]verall, the record demonstrates a Beneficiary that required continued pain management and physician oversight but without sufficient support for a terminal prognosis"); *Id.* at 1655 (concluding regarding patient S.M., without addressing contrary expert testimony, that "the Beneficiary did not have sufficient secondary conditions to support a reasonable expectation for a prognosis of six months or less.").

[2] In briefing, Defendant gives some possible explanations for why the ALJ may have discounted the expert's testimony. For example, it suggests that the QIC opinions were more reliable than the expert. (ECF 54 at 26–29). But Defendant may not retroactively explain the conclusions in the ALJ's opinion. *See Turpen*, 2012 WL at *9. And even Defendant's retroactive explanation fails to give any reason why the expert's opinions would be less reliable than those in the QIC. The ALJ's opinion does occasionally cherry-pick elements of the expert's testimony in its conclusions. *See, e.g., id.* at 1641 ("Dr. Leedy testified that the only comorbidity was high blood calcium"); *Id.* at 1646 ("Dr. Leedy's testimony indicates he had no major diet issues"); *Id.* 1655 ("Per Dr. Leedy's testimony, individuals with ALS typically expire due to secondary conditions"). But cherry-picking quotes is not the same as engaging with the complete reasoning and conclusions of expert testimony.

10

expert testimony to be unreliable or non-credible. This is grounds for remand. *See Clark v. Saul*, No. 1:20-CV-15-HAB, 2021 WL 164794, at *5 (N.D. Ind. Jan. 19, 2021).

### III. Application of Statutory Law

Plaintiff also argues that the ALJ misapplied two key provisions of the Social Security Act: The Section 1870 waiver provision, codified at 42 U.S.C. § 1395gg, and the Section 1879 limitation-of-liability provision, codified at 42 U.S.C. § 1395pp. The Court will address each in turn.

#### 1. Section 1870 Waiver Provision

Section 1870 has been interpreted by CMS to allow for waiver of overpayment claims against providers when the provider was "without fault" in interpreting eligibility requirements. CMS Pub. 100-06, Ch. 3 § 70.3. Plaintiff argues that the ALJ misapplied Section 1870 when he concluded that it did not apply to waive overpayments "as the Appellant/Provider was responsible for causing the overpayments." (ECF 43 at 1660). Defendant argues that Section 1870 does not apply because it concerns payments to individuals rather than providers.[3] This is correct. The Seventh Circuit has held that "waiver of overpayment liability for providers is not contemplated" by the statute. *Visiting Nurses Ass'n of Sw. Ind., Inc. v. Shalala*, 213 F.3d

---

[3] The Court acknowledges that the ALJ's cursory statement is somewhat ambiguous. In the interest of adequate issue treatment, the Court will construe the ALJ to have used the reasoning now presented by Defendant. *See Winsted v. Berryhill*, 923 F.3d 472, 478 (7th Cir. 2019) ("The court applies a common-sense reading to the entirety of an ALJ's decision").

352, 359 (7th Cir. 2000). [4] Plaintiff argues that *Visiting Nurses* decided the meaning of only 42 U.S.C. § 1395gg subsection (c), and that it is claiming waiver under subsection (b) instead. This argument misses both the structure of § 1395gg and the Seventh Circuit's reasoning in *Visiting Nurses*.

First, subsection (b) does not address waiver at all, but rather the conditions under which "proper adjustments shall be made . . . by the Secretary [of Health and Human Services], by decreasing subsequent payments [to individuals]" after "more than the correct amount is paid" to an individual. 42 U.S.C. § 1395gg(b)(1)–(2). The statute's heading is entitled "incorrect payments on behalf of individuals; payment adjustment." 42 U.S.C. § 1395gg(b). The "fault" language in subsection (b) describes the conditions under which adjustments shall be made to subsequent payments to individuals: when (1) the excess amount "cannot be recouped from" a service provider or (2) the provider was "without fault." 42 U.S.C. § 1395gg(b)(1). Thus, the section does discuss provider fault, but it has nothing to do with waiver; rather, it is the conditions under which the Secretary may decrease subsequent payments to an individual rather than attempting to recoup funds directly from a provider.

Subsection (c), entitled "Exception to subsection (b) payment adjustment," *does* discuss waiver, but with respect only to "an individual who is without fault." 42 U.S.C.

---

[4] The Court acknowledges that the Seventh Circuit's holding in *Visiting Nurses* appears to directly conflict with the CMS guidance, which states that "waiver of recovery of the overpayment from the provider/beneficiary should be considered per § 1870(c)." CMS Pub. 100-06, Ch. 3 § 70.3. But here, the Seventh Circuit, not agency interpretations, dictate the final interpretation of the statute. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 401 (2024).

§ 1395gg(c). Thus, in §1395gg's waiver subsection (c) there is no discussion of provider fault or eligibility.

Thus, *Visiting Nurses* decided the waiver question based on subsection (c) because that is the only plausible waiver provision in the statute. Indeed, in discussing subsection (b), the Court reiterated that "The entitlement to payments under 1395gg(b) is the individual's, not the provider's" and that "the [statute's] language merely creates prerequisites for the adjustments in Payments to the individual beneficiaries." *Visiting Nurses*, 213 F.3d at 356.

Thus, Plaintiff cannot claim relief under Section 1870/1395gg, and the ALJ opinion did not err inasmuch as it denied applicability on the grounds that a provider was seeking relief rather than an individual.[5]

### 2. Section 1879 Limitation-of-Liability Provision

Section 1879 limits a provider's liability for overpayments when the provider acted in good faith and could not have "reasonably been expected to know" that a service or patient would be covered. 42 U.S.C. § 1395pp(a)(2). Plaintiff argues that the ALJ misapplied this standard by dismissing its applicability to Plaintiff on the grounds that there was constructive notice through Medicare service notices, regulations published in the federal register, and "what is considered acceptable standards of practice by the local medical community." (ECF 43 at 1660).

---

[5] The parties debate whether Defendant is retroactively defending the ALJ's reasoning on different grounds. But this debate is irrelevant because even if the ALJ's reasoning was flawed, he reached the correct conclusion. Remand on harmless legal error is not proper. *See Todd v. Colvin*, No. 4:13-CV-00127-SEB, 2014 WL 4415925, at *5 (S.D. Ind. Sept. 4, 2014).

It may be true that in many circumstances, a provider might "reasonably [be] expected to know" that a service would be covered due to the specific regulations and nature of that service. *See Ambercity Hospice,* No. 20-56242, 2021 WL 4924750, at *1 (9th Cir. Oct. 21, 2021); *LivinRite, Inc. v. Azar*, 386 F. Supp. 3d 644, 665–66 (E.D. Va. 2019).

Even so, in other situations, the nature of the service may not be conducive to constructive notice—Section 1879 presumably exists precisely because in some cases these regulations are *not* always sufficient. *See* 79 Fed. Reg. 50452, 50470–71 (Aug. 22, 2014) (recognizing difficulties in perfectly specifying "clinical judgment regarding the normal course of [an] individual's illness" and emphasizing that "prognosis is not an exact science."). Any other reading would render the clause redundant. *See United States v. Turner*, 47 F.4th 509, 517 (7th Cir. 2022) (under the "anti-surplusage canon" courts "read statutory text with an eye toward avoiding rendering any language superfluous").

Thus, whether a provider could "reasonably have been expected to know" that a service was covered requires a case-by-case determination. It will depend on the specificity of the regulations in question and the susceptibility of the specific health conditions to a degree of ex-ante predictability in prognosis and treatment. A conclusory statement that the provider had notice through rules, regulations, and standards is not sufficient to explain why this *specific* service (hospice care of terminally ill patients) under these *specific* regulations or rules was sufficient to put the provider on notice such that it could "reasonably be expected to know" whether a patient fell in or out of the criteria. Moreover, specifically in the context of terminal illness, there are

regulatory indicators that rules alone may not always be sufficient to put a provider on notice. *See* 73 Fed. Reg. 32088, 32138 (June 5, 2008) (noting that the term "criteria" was removed from the regulations regarding hospice care "in order to remove any implications that there are specific CMS clinical benchmarks in this rule that must be met in order to certify terminal illness"). Here, the ALJ did not perform any analysis to explain why the facts of this case and nature of the legal and regulatory scheme allowed for constructive notice.

The ALJ's ruling that constructive notice can always be inferred under Section 1879 was an error as a matter of law. The ALJ must at least explain why constructive notice can be appropriately inferred under a particular regulatory scheme and treatment type. *See* supra pages 14–15. Remand on this issue is appropriate. *See Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).

CONCLUSION

For the foregoing reasons, The Court **VACATES** the administrative ruling (in part) as to the ALJ's determination with regard to patients B.A., K.C., W.F., and S.M., and **REMANDS** this case to the ALJ for further proceedings consistent with this opinion.

SO ORDERED on May 28, 2026.

/s/ *Cristal C. Brisco*
CRISTAL C. BRISCO, JUDGE
UNITED STATES DISTRICT COURT